## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CASE NO.

ROSICKI, ROSICKI & ASSOCIATES, P.C.
51 East Bethpage Road
Plainview, NY 11803,

Paramount Land, Inc.
584 Main St, Islip, NY 11751

Enterprise Process Service, Inc.
584 Main St fl 1, Islip, NY 11751

Petitioners,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION
3900 Wisconsin Ave., NW
Washington, DC 20016-2892,

Respondent.

Underlying Litigation

*United States of America ex rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.*
Civil Action No.: 1:12-Civ.-7177 (JSR)
United States District Court for the Southern District of New York

## MOVANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM FEDERAL NATIONAL MORTGAGE ASSOCIATION

Movants Rosicki, Rosicki & Associates, P.C., Paramount Land, Inc., and Enterprise Process Service, Inc. hereby moves for an order to compel the production of documents from the Federal National Mortgage Association and compel the Federal National Mortgage Association to withdraw the assertion of privilege with respect to documents in the possession, custody and control of Lyons McCloskey LLC, or alternatively, to transfer the motion to compel to the Southern District of New York where the Underlying Litigation, *United States ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.*, No. 1:12-cv-7199 (JSR), is pending. As demonstrated in the attached Memorandum of Law in Further Support of Movant's Motion to Compel and

Transfer Motion to Compel to Issuing Court, the documents described therein are not protected by the attorney-client privilege or work product doctrine and are highly relevant to the claims and defenses in the Underlying Litigation.   Transfer is also appropriate because resolution of the motion to compel involves familiarity with complex and determinative substantive issues in the Underlying Litigation, and the burden on the Federal National Mortgage Association would be *de minimis*.   The court should therefore grant Movant's motion to compel or, in the alternative, grant Movant's motion to transfer the motion to compel to the issuing court pursuant to Rule 45 of the Federal Rules of Civil Procedure.

Respectfully submitted,

_____

Stephen J. Rosen
Levine, Blaszak, Block & Boothby, LLP
20001 L St., N.W., Suite 900
Washington, D.C. 20036
srosen@lb3law.com

Daniel J. Horwitz*
Tracy A. Burnett*
McLaughlin & Stern, LLP
260 Madison Avenue, 18th Floor
New York, New York 10016

*Attorneys for Movant Rosicki, Rosicki
& Associates, P.C., et al*

* admission pro hac vice pending

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.

ROSICKI, ROSICKI & ASSOCIATES, P.C., et al.,

Movant,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

Respondent.

Underlying Litigation

*United States of America ex rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.*
Civil Action No.: 1:12-Civ.-7177 (JSR)
United States District Court for the Southern District of New York

MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PETITIONERS' MOTION TO COMPEL AND TRANSFER
MOTION TO COMPEL TO ISSUING COURT

Levine, Blaszak, Block & Boothby, LLP
2001 L St., N.W., Suite 900
Washington, D.C. 20036

McLaughlin & Stern, LLP
260 Madison Avenue, 18th Floor
New York, New York 10016

*Attorneys for Movant Rosicki, Rosicki & Associates, P.C., et al.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................6

   A.   Fannie Mae's Audit of its Retained Attorney Network ....................................................7

   B.   Investigation of Petitioners by the U.S. Attorney's Office ..............................................9

   C.   Expedited Discovery Schedule in the Underlying Action ..............................................11

   D.   Petitioners' Subpoena to Fannie Mae and its Outside Consultant Lyons McCloskey....12

ARGUMENT...........................................................................................................................17

   A.   Audit Related Documents Are Highly Relevant to Petitioners' Defenses......................18

       1. Fannie Mae Should be Compelled to Produce Documents Regarding Audits and
          Related Processes Because They Are Not Privileged..............................................21

       2. Documents and Communications Regarding the Audits are Also Not Protected by the
          Work-Product Doctrine ..........................................................................................24

       3. The Privilege Concerning Petitioners Should Be Waived Because the Rosicki Firm's
          Conduct is at Issue in the Litigation ......................................................................25

   B.   Fannie Mae Should Be Compelled to Produce Documents and Communications
       Exchanged with the Government Regarding Petitioners and the Underlying Action ....28

   C.   Fannie Mae Should Be Compelled to Produce Documents Regarding Fannie Mae's
       Investigation of Petitioners Regarding the Allegations in the Complaint ......................30

   D.   Fannie Mae Should Be Compelled to Produce Documents That Are Relevant to the
       Subject of the Falsity of the Claims...............................................................................30

       1. Documents Related to Fannie Mae Monitoring of the Quality, Reliability or
          Timeliness of the Services Provided by Firms in Connection with Foreclosures are
          Relevant to the Litigation and Should be Produced ...............................................30

       2. Fannie Mae Should Be Compelled to Produce Documents Regarding Fannie Mae
          Employee Training Related to Reimbursement of Foreclosure Expenses ..............33

   E.   Fannie Mae Should be Compelled to Produce Documents Regarding Market Rates for
       Foreclosure-Related Expenses.......................................................................................34

   F.   Transfer of the Motion to Compel to the Issuing Court is Warranted ...........................35

CONCLUSION.......................................................................................................................40

## TABLE OF AUTHORITIES

**CASES**

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 2011 U.S. Dist. LEXIS 127245
  (S.D.N.Y. Oct. 21, 2011) ................................................................................................18

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,*
  210 F.R.D. 506, 509 (S.D.N.Y. 2002) ......................................................................28, 29

*Cobell v. Norton,*
  213 F.R.D. 1, 6 (D.D.C. 2003) ......................................................................................26

*Diversified Group, Inc. v. Daugerdas,*
  304 F.Supp. 2d 507 (S.D.N.Y. 2003) ............................................................................24

*Duttle v. Bandler & Kass,*
  127 F.R.D. 46 (S.D.N.Y. 1989) ................................................................................24, 26

*Fed. Home Loan Mortg. Corp. v. Deloitte & Touche LLP,*
  309 F.R.D 41 (D.D.C. 2015) ..........................................................................40, 42, 43, 44

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.,*
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ......................................................................41, 44

*Federal Trade Comm'n v. TRW, Inc.,*
  628 F.2d 207 (D.C. Cir. 1980) ......................................................................................23

*First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & CO.,*
  110 F.R.D. 557 (S.D.N.Y. 1986) ..............................................................................30, 31

*Friedman v. Bache Halsey Stuart Shields, Inc.,*
  738 F.2d 1336 (D.C. Cir. 1984) ....................................................................................36

*Hunton & Williams v. U.S. Dep't of Justice,*
  590 F.3d 272 (4th Cir. 2010) ........................................................................................32

*In re Central Gulf Lines,*
  2001 U.S. Dist. LEXIS 297 (E.D. La. Jan. 12, 2001) ....................................................26

*In re Denture Cream Prods. Liab. Litig.,*
  292 F.R.D. 120, 123 (D.D.C. 2013). ..............................................................................18

*In re Exxon Valdez,*
  142 F.R.D. 380 (D.D.C. 1992) ......................................................................................32

*In re Grand Jury Subpoena Served Upon Doe,*
  781 F.2d 238 (2d Cir. 1986) ..........................................................................................26

*In re Micron Tech., Inc. Sec. Litig.*,
 264 F.R.D. 7 (D.D.C. 2010) ................................................................................19

*In re Sealed Case*, 141 F. 3d 337, 341 (D.C. Cir. 1998) ............................................40

*Independent Productions Corp. v. Loew's, Inc.*,
 22 F.R.D 266, 276-77 (S.D.N.Y. 1958)................................................................28

*Jewish War Veterans of the United States of Am., Inc. v. Gates*,
 506 F.Supp.2d 30, 42 (D.D.C. 2007) ..................................................................18

*Judicial Watch, Inc. v. Valle Del Sol, Inc.*,
 14-mc-0538(BAH), 2014 WL 4954368 (D.D.C. Oct. 3, 2014).................................44

*Kafack v. Primerica Life Ins. Co.*,
 934 F. Supp. 3 (D.D.C. 1996)...............................................................................43

*Meyerhofer v. Empire Fire & Marine Ins. Co.*,
 497 F.2d 1190 (2d Cir. 1974) ..............................................................................30

*Nguyen v. Excel Corp.*,
 197 F.3d 200 (5th Cir. 1999) ...............................................................................25

*Peyser v. Searle Blatt Co.*,
 2003 U.S. Dist. LEXIS 22037 (S.D.N.Y. Dec. 8, 2003) .........................................28

*Pritchard v. County of Erie*,
 546 F.3d 222 (2d Cir. 2008) ................................................................................28

*Robertson v. Cartinhour*,
 2011 U.S. Dist. LEXIS 126030 (S.D.N.Y. Oct. 28, 2011)......................................44

*S.E.C. v. Wyly*,
 2011 WL 2732245 (S.D.N.Y. July 5, 2011)..........................................................33

*United States Dep't of Treasury v. Pension Benefit Guar. Corp.*,
 301 F.R.D. 20 (D.D.C. 2014). ..............................................................................18

*Unites States ex rel. Baklid-Kunz v. Halifax Hospital Medical Center*,
 2012 U.S. Dist. LEXIS (M.D. Fla. Nov. 6, 2012) ..................................................23

*United States ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.*, 2018
 U.S. Dist. LEXIS 105784 (S.D.N.Y. June 23, 2018) ....................................... passim

*United States v. Constr. Prods. Research, Inc.*,
 73 F.3d 464 (2d Cir. 1996) .................................................................................22

*United States ex rel. Gale v. Omnicare, Inc.*,
 2013 U.S. Dist. LEXIS 143831 (N.D. Ohio Oct. 4, 2013)......................................24

*United States Postal Serv. v. Phelps Dodge Re. Corp.*,
    852 F.Supp. 156 (E.D.N.Y. 1994) ...................................................................................23, 26

*United States v. Keystone Sanitation Co.*,
    885 F. Supp. 672 (M.D. Pa 1994)...........................................................................................25

*United States v. Naegele*,
    468 F.Supp.2d 165 (D.D.C. 2007)....................................................................................24, 26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016)..................................................................................................3, 4, 19

*von Bulow v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987) ..................................................................................................22

*Wultz v. Bank of China, Ltd*,
    304 F.R.D. 38 (D.D.C. 2014) .....................................................................................40, 41, 42

*XY, LLC v. Trans Ova Genetics, L.C.*,
    2014 WL 4437728 (D.D.C. Sept. 10, 2014)............................................................................44

**STATUTES**

31 U.S.C. §§ 3729 *et seq* ...............................................................................................................1

**OTHER AUTHORITIES**

Federal Housing Finance Agency Office of Inspector General,
    FHFA's Oversight of Fannie Mae's Default-Related Legal Services (Sept. 30, 2011) ..........8, 9

Restatement (Second) of Contracts § 161(b)................................................................................31

Restatement (Second) of Torts § 551(e) & cmt j..........................................................................31

**RULES**

Fed. R. Civ. P. 26(b)(1). ................................................................................................................18

Fed. R. Civ. P. 45(f) ...............................................................................................................18, 31

Rosicki, Rosicki & Associates, P.C. (the "Rosicki firm"), Paramount Land, Inc. ("Paramount"), and Enterprises Services, Inc. ("Enterprise") (collectively the "Petitioners") submit this memorandum of law in support of their motion to: (1) compel the Federal National Mortgage Association ("Fannie Mae") to comply with the subpoenas served on Fannie Mae pursuant to Rule 45 of the Federal Rules of Civil Procedure; (2) compel Fannie Mae to withdraw its assertion of the privilege with respect to documents in the possession, custody or control of Lyons McCloskey LLC; and concurrently, (3) transfer the motion to compel to the United States District Court for the Southern District of New York, where the underlying action, *United States ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.*, No. 1:12-cv-7199-JSR (S.D.N.Y.) ("the Underlying Action"), is pending.

## PRELIMINARY STATEMENT

This dispute arises out of Fannie Mae's refusal to produce documents, or to allow its consultant to produce documents, that are not available by any other means and are crucial to Petitioners' defenses against the government's allegation that Petitioners violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.

Far from being a disinterested third-party, Fannie Mae is the purported aggrieved party in the Underlying Action. The government brought the Underlying Action on behalf of Fannie Mae alleging that Petitioners caused Fannie Mae to pay false or fraudulent claims for foreclosure-related expenses such as process service and title searches. *See* First Amended Complaint-In-Intervention ("Complaint"), attached as Exhibit A to the Declaration of Tracy Burnett, Esq. (hereafter "Burnett Decl."). The Rosicki firm, when acting as counsel on behalf of Fannie Mae and its mortgage servicers in foreclosure proceedings related to Fannie Mae-owned mortgages, engaged Paramount and Enterprise to effectuate service and perform title searches required as part

1

of the foreclosure and post-foreclosure eviction process.  Ex. A, Burnett Decl. ¶¶ 1, 2.  The Complaint in the Underlying Action asserts that Enterprise and Paramount "applied exponential mark-ups" that "exceed[ed] market rates" to their expenses that the Rosicki firm then submitted to mortgage servicers, who in turn sought and received reimbursement from Fannie Mae for the expenses in question.[1]  *Id.*  The government alleges that these "inflated" expenses were false or fraudulent because they were in violation of the Rosicki firm's retention agreement with Fannie Mae; specifically, "Fannie Mae would not have considered those expenses to be in compliance with the [Fannie Mae] servicing guide requirement that all foreclosure expenses submitted by foreclosure firms must be 'actual, reasonable, and necessary.'"  *Id.* ¶¶ 179, 180.  The government further alleges that had Fannie Mae known that the Petitioners were "overcharging" for foreclosure expenses, Fannie Mae would not have reimbursed those expenses.  *Id.* ¶¶ 179-181.

At its core, the Underlying Action boils down to three principal areas of dispute: (1) did the claims for reimbursement submitted by the servicers to Fannie Mae certify that the expenses were "actual, reasonable, and necessary"; (2) were the claims non-compliant with that certification; and (3) was that alleged noncompliance material to Fannie Mae's decision whether it would or would not reimburse those expenses.  Despite properly issued subpoenas and good faith attempts to alleviate any burden on Fannie Mae in responding to the subpoenas, Fannie Mae has failed to produce the documents, and instructed its consultant to withhold documents, sought relevant to those three categories.

Documents regarding any certification that may have explicitly or implicitly accompanied the claim for reimbursement are central to Petitioners' defense.  The *sine qua non* of a FCA

---

[1] The government's First Amended Complaint added allegations that Petitioners also fraudulently inflated expenses for eviction-related services, which Petitioners then billed directly to, and were subsequently reimbursed by, Fannie Mae.  Ex. A, Burnett Decl. ¶ 35.

violation is the submission of a claim that is actually false.  The government argues the claims at issue in the Underlying Action were false because the claims submitted by the servicers implicitly certified compliance with the provision in the Fannie Mae Servicing Guide that expenses must be "actual, reasonable, and necessary"; noncompliance thus rendered the claims false.  Under the Supreme Court's decision in *Universal Health Services Inc. v. United States ex rel. Escobar*, whether the servicer's submission of a claim to Fannie Mae implicitly certified compliance with the Servicing Guide requires examining what contractual provisions were critical to the transaction between the servicers and Fannie Mae.  *See* 136 S. Ct. 1989, 1999-2000 (2016) ("representations that state the truth only so far as it goes, while omitting critical qualifying information can be actionable misrepresentations").   It also requires examining what Fannie Mae employees responsible for reviewing and approving reimbursement requests actually presumed the claim certified – if anything.  *See U.S. ex rel. Grubea v. Rosicki, Rosicki & Associates, P.C., et al.,* 2018 U.S. Dist. LEXIS 105784, at *41 (S.D.N.Y. June 23, 2018) ("upon receiving the claim, Fannie Mae would probably—but wrongly—have concluded the expenses" submitted were reasonable and actual expenses).  Answering either question requires information from Fannie Mae.

Moreover, because the government argues that Petitioners' expenses were not "actual, reasonable and necessary" by "exceed[ing] market rates," Ex. A, Burnett Decl. ¶¶ 2, 76, 87, 103, discovery about those market rates is critical to Petitioner's defense.  Fannie Mae was – and still is – in the best position to know the market rates for its foreclosure expenses and, therefore, Fannie Mae is in the best position to know whether Petitioners were in fact noncompliant.  Fannie Mae knew better than anyone what the market rate was because it reviewed thousands of claims for expenses from its own network of servicers and law firms in the relevant market, and it conducted an extensive audit of its law firms' expenses during the heart of the time period that the government

3

alleges Petitioners defrauded Fannie Mae.  Fannie Mae also knew the relevant market rates because it effectively dictated the prices for those services in connection with Fannie Mae-owned mortgages.

Furthermore, contrary to the government's assertions that Petitioners' expenses were not compliant with the Fannie Mae Servicing Guide and that purported non-compliance would have had a material effect on Fannie Mae's reimbursement decisions, there is ample evidence that Fannie Mae: (1) audited the Rosicki firm and other law firms in its attorney network to review those firms' compliance with Fannie Mae requirements, (2) looked specifically at Petitioners' expenses, and (3) continued to reimburse Petitioners' expenses for years after the audits.  The Supreme Court in *Escobar* held that a false claim based on noncompliance "with a statutory, regulatory, or contractual requirement *must be material* to the Government's payment decision in order to be actionable under the False Claims Act."  136 S. Ct. at 1996 (emphasis added).  Evidence that the government continued to pay claims after becoming aware of the claimant's alleged noncompliance with applicable statutory, regulatory, or contractual provisions is "very strong evidence" that the alleged noncompliance was not material to payment.  *Id.* at 2003.  That Fannie Mae audited Petitioners and continued to reimburse servicers for Petitioners' expenses means either Petitioners' expenses were compliant with Fannie Mae requirements or Petitioners' non-compliance was not material to Fannie Mae's payment decision.  Either way, discovery on this issue is critical to Petitioners' defenses.

When Petitioners sought documents from Fannie Mae related to the certification issue, the audits and the market rates for foreclosure expenses, Fannie Mae either refused or failed to provide discovery.  With respect to audits "and related processes," Fannie Mae has asserted that responsive documents are privileged.  Not only has Fannie Mae refused to provide documents related to the

4

audits and related processes, Fannie Mae has asserted a privilege with respect to documents in the possession, custody and control of Lyons McCloskey, the outside consultant it retained to assist in one of the audits, and instructed Lyons McCloskey not to comply with Petitioners' subpoena by claiming a privilege over the requested documents. Fannie Mae objected to other requests as in the subpoena as "too broad and non-specific."

No basis exists for Fannie Mae's assertion that the documents Petitioners seek from Fannie Mae and Lyons McCloskey are privileged and should be protected from disclosure. First, documents related to the audits and related processes concerning foreclosure-related expenses are not privileged because information concerning expenses and billing are not protected by the attorney-client privilege or work product doctrine. Second, the privilege should be waived with respect to documents related to Petitioners because the Rosicki firm's conduct is at issue in the litigation. Under federal common law, the attorney-client privilege may be waived by implication where, as here, a party has placed the attorney's conduct directly at issue. Moreover, privilege waiver is highly favored where, as here, the discovery being sought is vital to Petitioners' defenses and it would be fundamentally unfair to deny Petitioners access. Petitioners cannot defend themselves against the allegations in the Complaint, which center on the Rosicki firm's conduct in its representation of Fannie Mae, when Fannie Mae continues to assert a privilege to suppress documents regarding that conduct from both Petitioners and the government.

Fannie Mae was served with subpoenas on July 12, 2018 and July 16, 2018, and agreed to complete its production by August 28, 2018. That date has come and gone. Fannie Mae has only produced a limited set of documents to-date that do not touch on many of the requests in the subpoena. Importantly, Fannie Mae has produced no documents responsive to Petitioners' requests for information related to market rates or the implicit certification issue, and produced

only a handful of documents regarding one audit Fannie Mae conducted. The court in the Underlying Action has set a very tight, inflexible discovery schedule in which all discovery must be completed by December 14, 2018, and moving papers for a motion for summary judgment must be served by December 14, 2018. With a scant three (3) months until the close of discovery and moving papers for a summary judgment motion are due, Petitioners must receive documents in response to the subpoenas immediately in order to be able to analyze the documents and utilize them for experts and forthcoming depositions. Petitioners have prioritized those narrowed requests that are relevant to the case and most critical to Petitioners' defenses, and respectfully seek an order to compel production of documents by Fannie Mae, as detailed herein, immediately.

Petitioners respectfully request that the motion to compel be transferred to the Southern District of New York where the action is pending. Transfer is appropriate here because resolution of the Motion to Compel involves familiarity with complex and determinative substantive issues in the Underlying Action, which the Southern District of New York is already familiar. Moreover, transfer will facilitate compliance with the very tight discovery schedule. Further, since Fannie Mae regularly conducts business in the Southern District of New York and avails itself of the court there, the burden on Fannie Mae would be *de minimis*.

## BACKGROUND

Fannie Mae engaged financial institutions, called servicers, to perform or oversee various actions in connection with residential mortgages owned by Fannie Mae. Ex. A, Burnett Decl. ¶ 25. Among other things, the servicer is responsible for pursuing foreclosure when a borrower becomes delinquent on his or her payments. The servicer retains a foreclosure law firm, such as the Rosicki firm, to represent it in connection with a foreclosure on a Fannie Mae-owned mortgage. *Id.* ¶ 26. The Rosicki firm, acting as counsel for servicers in proceedings related to Fannie Mae-owned

mortgages, engaged Enterprise and Paramount to serve process and perform title searches in connection with foreclosures and post-foreclosure evictions. *Id.* ¶ 2.

In the Underlying Action, the government alleges that Enterprise and Paramount outsourced the majority of its work to third-party vendors to perform the services and then applied "exponential mark-ups" to those vendor's bills. *Id.* According to the government, Enterprise and Paramount then submitted their invoices, "which exceeded market rates", to the Rosicki firm. *Id.* The Rosicki firm billed the servicers for the expenses submitted by Enterprise and Paramount, allegedly with knowledge that the servicers would submit claims to Fannie Mae for reimbursement of those expenses. *Id.* The servicers submitted claims to Fannie Mae for reimbursement of Petitioners' expenses using a Cash Disbursement Request Form 571. *Id.* ¶ 34. The government alleges that "Defendants' submission of these fraudulently inflated expenses to the servicers, which then sought and received reimbursement from Fannie Mae, caused Fannie Mae to pay millions of dollars for falsely and fraudulently inflated foreclosure expenses generated by Defendants." *Id.* ¶ 187.

## A. Fannie Mae's Audit of its Retained Attorney Network

When the Rosicki firm was retained to represent a servicer in connection with a foreclosure on a Fannie Mae mortgage, the firm was required to enter into a retention agreement with Fannie Mae, as well as the servicer.[2] *Id.* ¶ 28-31. The Rosicki firm executed a retention agreement with Fannie Mae to join its list of approved foreclosure firms called the Retained Attorney Network. *Id.* ¶ 27-28. After Fannie Mae terminated the Retained Attorney Network in 2013, the Rosicki

---

[2] When Fannie Mae sought to initiate eviction proceedings related to a property for which it owns the mortgage loan, it would retain the Rosicki firm directly as its eviction attorney. Ex. A, Burnett Decl. ¶35.

firm executed another limited retention agreement with Fannie Mae to perform work on Fannie Mae-owned mortgages. *Id.* ¶ 30. The retention agreements required the Rosicki firm to follow Fannie Mae's Servicing Guide, which provided that foreclosure-related expenses should be "actual, reasonable and necessary." *Id.* ¶ 31, 38. Fannie Mae's retention agreement with the Rosicki firm gave Fannie Mae the right to review and audit the firm's invoices, even after payment by the servicer, and to examine from time to time the firm's books, records, and case files pertaining to its work on Fannie-owned mortgages. Agreement between Fannie Mae and Rosicki, Rosicki & Associates dated April 17, 1998, attached as Exhibit B to Burnett Decl. During the time period covered in the Complaint, Fannie Mae also visited the firm numerous times for on-site review of files of Fannie Mae-owned mortgages in foreclosure and eviction proceedings being handled by the Rosicki firm. In addition to regular on-site reviews, the Rosicki firm was also subject to at least four more exhaustive audits by Fannie Mae beginning in 2003.[3]

According to a report by the Inspector General for the Federal Housing Finance Agency ("FHFA"), as the volume of foreclosures rose after 2007, the reports of foreclosure abuses by servicers and foreclosure law firms increased. Federal Housing Finance Agency Office of Inspector General, FHFA's Oversight of Fannie Mae's Default-Related Legal Services 11-12 (Sept. 30, 2011), https://goo.gl/A8ZyuB (hereafter "FHFA Report"). Fannie Mae undertook efforts to conduct a more exhaustive review of the law firms retained to handle Fannie Mae-owned mortgages in foreclosure proceedings to address the allegations of foreclosure abuses. *Id.* at 18.

---

[3] The Rosicki firm was audited by Fannie Mae in 2003, 2004, 2005 and 2010. Email from L. Thornton, Fannie Mae to C. Rosicki dated May 27, 2003, attached as Exhibit C to Burnett Decl.; Letter from L. Thornton, Fannie Mae to C. Rosicki dated Sept. 7, 2007, attached as Exhibit D to Burnett Decl.; Fannie Mae Retained Attorney Network Audit Instructions and Questionnaire, attached as Exhibit E to Burnett Decl.

As part of those efforts, in 2010, Fannie Mae retained an outside consultant, Lyons McCloskey, to perform an audit of the law firms in its Retained Attorney Network. *See id.* at 18; Burnett Decl., Ex. E.   The audit focused on a review of each firm's compliance with its engagement letter with Fannie Mae, including a review of fees and costs charged.   Burnett Decl., Ex. E. at 1.   Lyons McCloskey required the production of, among other things:

- All invoices and back-up information in connection with all costs and expenses included in any [] invoice submitted to servicer or Fannie Mae;

- The invoices submitted to the firm by its vendors on Fannie Mae-owned loans in connection with any cost, and all invoices submitted to the vendor by the secondary vendor for any outsourced work on the same loan.

*Id.* at 2, 5.[4]   Lyons McCloskey also looked at whether the rates charged by vendors used by firms were "competitive with rates charged for similar services in the open market and in compliance with Fannie Mae guidelines." *Id.* at 4.   As part of the audit, Petitioners produced documents and information to Lyons McCloskey regarding its foreclosure-related expenses, and Lyons McCloskey conducted an on-site visit of the Rosicki firm. *Id.*   Lyons McCloskey documented their work and findings in various reports and memorandum to Fannie Mae.   FHFA Report at 16-19.

### B.   Investigation of Petitioners by the U.S. Attorney's Office

The initial *qui tam* complaint in this matter filed by Relator Peter Grubea on September 24, 2012, triggered an almost six-year investigation by the United States Attorney's Office for the Southern District of New York (the "government"), into the underlying allegations of "illegal and excessive claims made by the defendants for reimbursement from Government programs,"

---

[4] Fannie Mae also periodically surveyed its Retained Attorney Network, including the Rosicki firm, about matters related to the underlying conduct in the Complaint.   Email from S. Reid, Fannie Mae to K. Poole, *et al.*, dated July 23, 2010, attached as Exhibit F to Burnett Decl.

including Fannie Mae.  Complaint, *United States v. Rosicki, Rosicki & Associates, P.C. et al,* No. 12-cv-07199. ECF No. 25 ¶ 2 (S.D.N.Y. Sept. 24, 2012), attached as Exhibit G to Burnett Decl. During the investigation, the government issued a subpoena to the Rosicki firm dated November 22, 2013, which sought, among other things, documents and communications related to expenses in connection with Fannie Mae-owned mortgages in foreclosure proceedings.  Subpoena for the Production of Documents dated Nov. 22, 2013, attached as Exhibit H to Burnett Decl.  Shortly after receiving the November 22, 2013 subpoena, the Rosicki firm notified Fannie Mae of the government's investigation and the subpoena.  Email from K. Poole to S. Luttrull, *et al.* dated Dec. 6, 2013, attached as Exhibit I to Burnett Decl.  In the ensuing five years before the government's Complaint was filed, Petitioners periodically updated Fannie Mae regarding the status of the investigation.  Even though the Relator's complaint, and the attendant government investigation, were ostensibly on Fannie Mae's behalf, Fannie Mae repeatedly affirmed by phone, and subsequently in writing, that it was not waiving the privilege with respect to documents or communications being sought by the government related to Fannie Mae, and instructed the Rosicki firm to withhold documents from the government that Fannie Mae designated as privileged, including documents related to audits.  *See e.g,* Email from T. Edel, Fannie Mae dated January 15, 2016, attached as Exhibit J to Burnett Decl.

After the government notified Petitioners in February 2018, that it intended to intervene in the Relator's action against Petitioners, Petitioners engaged in discussions with the U.S. Attorney's Office for the Southern District of New York, and the main office of the Department of Justice, Civil Division in Washington D.C., regarding the matter.  On March 2, 2018, the Rosicki firm had a telephone conference with Fannie Mae in which the firm asked Fannie Mae to waive the privilege so that Petitioners may have a fuller conversation with the government about all facts applicable

to the government's claims and Petitioners' defenses in the action, including providing documents and information related to Fannie Mae's audits of Petitioners. Email from T. Edel, Fannie Mae to K. Poole dated March 5, 2018, attached as Exhibit K to Burnett Decl. Fannie Mae only consented to the production of two redacted audit-related documents to the government (a total of three pages), but otherwise, declined to waive the privilege. *Id.*

Before the government's Complaint was filed, Petitioners repeatedly raised with the government the issue that Fannie Mae was refusing to waive privilege. Petitioners discussed the privilege issue with the government in meetings on March 6, 2018, March 15, 2018 and March 26, 2018. Petitioners even asked the government to discuss a privilege waiver with Fannie Mae. However, the government declined to do so, informing Petitioners that it was Petitioners' burden to convince Fannie Mae to waive the privilege. Ultimately, the government filed its Complaint and proceeded to prosecute its claims knowing that Fannie Mae, a central principal in the case, would not waive the privilege.

### C. Expedited Discovery Schedule in the Underlying Action

On March 27, 2018, Judge Rakoff of the United States District Court for the Southern District of New York unsealed the Relator's complaint and amended complaints previously filed in this action. Concurrently, the government filed its Complaint. During a court conference on April 19, 2018, the Court entered a Civil Case Management Plan, which set December 14, 2018 as the date for the end of fact discovery. The Case Management Plan also provided that moving papers for a summary judgment motion must be served by December 14, 2018. A trial date was set for March 18, 2019. The Court emphasized that the parties would be held to a very tight discovery schedule and an immovable trial date. Tr. of Apr. 17, 2018 Court Conference, attached

11

as Exhibit L to Burnett Decl.  The Court also stayed discovery pending briefing and a decision on defendants' motion to dismiss.

On June 23, 2018, the Court issued its opinion and order denying Petitioners' motion to dismiss.  *Grubea,* 2018 U.S. Dist. LEXIS 105784, at \*58.

### D. Petitioners' Subpoena to Fannie Mae and its Outside Consultant Lyons McCloskey

Petitioners issued a subpoena to Fannie Mae pursuant to Rule 45 of the Federal Rules of Civil Procedure, which was served on July 12, 2018.  The subpoena sought, among other things: (i) documents and communications concerning any audit, examination, investigation or review of, or visit to, Petitioners and Fannie Mae's Retained Attorney Network; (ii) documents concerning Fannie Mae's investigation of Petitioners and the allegations in the government's First Amended Complaint-in-Intervention; (iii) documents regarding the training of Fannie Mae employees related to the reimbursement of foreclosure-related expenses; and (iv) documents related to any analysis of the market rate for foreclosure-related expenses. *See* Subpoena to Fannie Mae dated July 12, 2018, attached as Exhibit M to Burnett Decl.

Petitioners served a second subpoena on Fannie Mae on July 16, 2018.  Subpoena to Fannie Mae dated July 16, 2018, attached as Exhibit N to Burnett Decl.  The second subpoena was identical to the first subpoena except it added a request for documents concerning Fannie Mae's review of the reliability, timeliness and quality of the law firms retained to handle Fannie Mae-owned mortgages in foreclosure proceedings, and revised the time period responsive to the subpoena for all requests (hereafter the "Subpoena").  On July 25, 2018, Fannie Mae's outside counsel responded to the Subpoena and objected to, among other things, the requests regarding documents and communications related to "audits and related processes."   Objections and Responses to Subpoena Duces Tecum, attached as Exhibit O to Burnett Decl.

Petitioners also issued a subpoena to Lyons McCloskey, which was served on July 12, 2018 ("Lyons Subpoena"). Subpoena to Lyons McCloskey dated July 12, 2018, attached as Exhibit P to Burnett Decl. The subpoena sought documents and communications related to the audit it conducted of law firms, including the Rosicki firm, related to their representation of Fannie Mae. On July 26, 2018, Lyons McCloskey's outside counsel stated during a meet and confer by telephone that Fannie Mae advised them that it was asserting a privilege with respect to the audits and instructed Lyons McCloskey that, pursuant to a contract between Fannie Mae and Lyons McCloskey, it could not comply with Petitioners' subpoena.

Petitioners have made every reasonable effort to narrow the requests to Fannie Mae and work with Fannie Mae to facilitate the production of documents in response to the Subpoena. Counsel for Petitioners met and conferred with counsel for Fannie Mae by telephone on July 27, 2018. During the conference call, the parties discussed each request in the Subpoena *ad seriatim* in an effort to resolve disputed objections. In an effort to minimize any burden with complying with the Subpoena, Petitioners agreed to substantially narrow the scope of the Subpoena by, among other things, limiting the time period responsive to the Subpoena, limiting the requests to matters related to foreclosure and eviction proceedings in New York State, and limiting the requests related to expenses to costs in connection with process service, title search and publication. Letter from T. Burnett to K. Carroll dated July 30, 2018, attached as Exhibit Q to Burnett Decl. Counsel for Fannie Mae stated that it has been Fannie Mae's position that documents and communications related to audits and related processes conducted by or on behalf of Fannie Mae are privileged. *Id.* Accordingly, Fannie Mae's counsel stated that Fannie Mae would likely not be producing documents in response to the requests related to audits and related processes although it was still analyzing the matter. Fannie Mae's counsel stated that Fannie Mae would respond early the

following week regarding its search for and production of documents in response to the Subpoena. *Id.*

On August 1, 2018, Fannie Mae's counsel advised that they were "working on a further response" and hoped to have a response "by the end of the week." Emails between K. Carroll and T. Burnett dated Aug. 1, 2018, attached as Exhibit R to Burnett Decl. In response, Petitioners emphasized the urgency of a response to the Subpoena. *Id.* Petitioners stated that, given the tight discovery schedule in the litigation, a response was needed from Fannie Mae by Friday, August 3, 2018, regarding whether Fannie Mae intended to comply with the Subpoena or Petitioners would proceed as if Fannie Mae's July 25, 2018 objections stand despite Petitioners' good faith efforts to narrow the requests over them. *Id.* Petitioners further asked Fannie Mae to let them know by August 3, 2018, whether it would continue to assert a privilege with respect to documents in Lyons McCloskey's possession, custody and control, which are responsive to Petitioners' subpoena. *Id.*

On August 3, 2018, Fannie Mae responded to Petitioners' proposed narrowed subpoena requests by stating once again that Fannie Mae has "claimed privilege in the past with respect to 'audits' and related processes as called for in your requests, and would expect to do so here, as well", which would "affect Fannie Mae's responses to [the requests related to audits], as well its instructions to Lyons McCloskey." Letter from K. Carroll to T. Burnett dated Aug. 3, 2018, attached as Exhibit S to Burnett Decl. Counsel stated that Fannie Mae was analyzing its options and hoped to have a definite decision on the issue by the next week. Fannie Mae also refused to produce "documents and communications concerning any investigation conducted by or on behalf of Fannie Mae related to the allegations in the [government's] complaint." *Id.* Although Petitioners explained that the request was seeking documents related to any investigation of Petitioners related to the allegations in the Complaint, Fannie Mae contended that the request was

"too broad and non-specific." *Id.* In addition, Fannie Mae refused to produce documents it may have exchanged with the government regarding Petitioners and the allegations in the Complaint because it claimed that Petitioners are obligated to get those documents from the government and not Fannie Mae. *Id.* Fannie Mae also claimed that the documents were protected from disclosure by the common-interest privilege and the work product doctrine. *Id.*

On August 13, 2018, Fannie Mae finally confirmed that it would assert privilege with respect to the audit process and that it would instruct Lyons McCloskey to preserve that privilege as well and not produce documents in response to Petitioners' subpoena. Email from K. Carroll to T. Burnett dated Aug. 13, 2018, attached as Exhibit T to Burnett Decl. Fannie Mae advised that it was considering whether to produce communications from Fannie Mae to each of the New York law firms that were subject to the audit advising of any deficiencies the audit found but it would not produce any other document regarding audits, including documents regarding the "audit process," the vendor invoices produced to Fannie Mae and/or Lyons McCloskey during the audit, the secondary vendor invoices for the same costs that were produced to Fannie Mae and/or Lyons McCloskey, the information received regarding the market rate charged by vendors for foreclosure-related expenses or any other document that would substantiate that Fannie Mae and/or Lyons McCloskey had audited the conduct at issue in the complaint. Fannie Mae asserted that the audits were privileged because they were conducted on behalf of Fannie Mae's in-house counsel regarding compliance with legal obligations.[5]

---

[5] Counsel for Fannie Mae did not mention whether Fannie Mae was also asserting a privilege with respect to documents related to examinations, investigations, reviews of, or visits to, law firms that were also called for in the Subpoenas, but Petitioners assume that Fannie Mae has rested on its objections based on claims of privilege articulated in its August 3, 2018 correspondence because no such documents have been produced to date. *See* Ex. S, Burnett Decl.

By email on August 27, 2018, Fannie Mae confirmed that it would complete its production of documents in response to the Subpoena by August 29, 2018. Email from K. Carroll to T. Burnett dated Aug. 27, 2018, attached as Exhibit U to Burnett Decl. To date, Fannie Mae has produced only 139 documents, but no documents related to its investigation of Petitioners or the market rates related to foreclosure-related expenses. Fannie Mae produced eight letters from Fannie Mae to New York area law firms, including the Rosicki firm, that were subject to the audit telling each of them where the audit showed that the firm failed to comply with certain requirements of its engagement agreement with Fannie Mae, but provided no other documents related to audits, examinations, investigations, reviews of, or visits to, Petitioners or any other firm. Nor has Fannie Mae provided a privilege log of the documents being withheld based on a claim of privilege. In this motion, Petitioners are seeking to compel discovery responsive to the Subpoena requests for documents concerning:

- Any examination, audit, investigation, reviews of, or visit to, Petitioners or law firms related to their representation of Fannie Mae in foreclosure and/or post-foreclosure eviction proceedings in New York State (Requests 1-5 in Ex. N, Burnett Decl.);
- Any investigation conducted by or on behalf of Fannie Mae related to Petitioners and the allegations in the Complaint (Request 9 of Ex. N, Burnett Decl.);
- Documents and communications received or provided to the government regarding Petitioners, Fannie Mae's investigation of Petitioners, the Underlying Action and the allegations in the government's Complaint (Requests 10-11 of Ex. N, Burnett Decl.).
- Any report, review, analysis, study or survey conducted by or on behalf of Fannie Mae related to title search or service of process costs in foreclosure or post-foreclosure eviction proceedings (Requests 6-8 of Ex. N, Burnett Decl.).
- Fannie Mae training that relates to reimbursement of foreclosure expenses, including training of Fannie Mae employees related to Form 571 and what to look for to ensure compliance with Fannie Mae's Servicing Guide (Request 16 of Ex. N, Burnett Decl.); and
- Any monitoring, report, review, analysis, study or survey conducted by or on behalf of Fannie Mae related to the quality, reliability and timeliness of the services provided by servicers, law firms or law firm vendors in connections with foreclosure or post-foreclosure eviction proceedings (Request 22 of Ex. N, Burnett Decl.).

Petitioners are also seeking to compel Fannie Mae to withdraw the assertion of privilege with respect to documents in the possession, custody and control of its consultant, Lyons McCloskey, so that Lyons McCloskey will produce documents responsive to the subpoena served upon it.

## ARGUMENT

The Federal Rules of Civil Procedure authorize broad discovery "regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Discovery obtained from a nonparty pursuant to Rule 45 has 'the same scope as provided in Rule 26(b).'" *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013); Fed. R. Civ. Pro. 45(d) advisory committee's note to 1946 and 1948 amendments. "Limiting discovery . . . pursuant to Rule 26 and/or Rule 45 goes against courts general preference for a broad scope of discovery." *U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 301 F.R.D. 20, 25 (D.D.C. 2014) (quotations omitted). "[T]he general policy favoring broad discovery is particularly applicable where, as here, the court making the relevance determination has jurisdiction only over the discovery dispute, and hence has less familiarity with the intricacies of the governing substantive law than does the court overseeing the underlying litigation." *Jewish War Veterans of the United States of Am., Inc. v. Gates*, 506 F.Supp.2d 30, 42 (D.D.C. 2007) (citation omitted). The person objecting to the discovery has the burden to demonstrate that the requested documents are privileged or burdensome. *See In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 2011 U.S. Dist. LEXIS 127245, at *6 (S.D.N.Y. Oct. 21, 2011).

**A. Audit Related Documents Are Highly Relevant to Petitioners' Defenses**

The documents Petitioners seek related to the audits and other related processes conducted by or on behalf of Fannie Mae regarding foreclosure-related expenses are unquestionably relevant to the Underlying Action and Petitioners' defenses. The government asserts in its Complaint that if Fannie Mae had known about the markup Enterprise and Paramount purportedly added to the third-party vendor bills that would have influenced Fannie Mae's decision whether to reimburse Petitioners' foreclosure-related expenses. But the fact is that Fannie Mae did know all about Petitioners' billing practices and continued to reimburse Petitioners' expenses. "It is well established a false claim or statement is actionable only if it is 'material' to the false or fraudulent claim for payment. . . . In assessing materiality, courts look to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Grubea,* 2018 U.S. Dist. LEXIS 105784, at \*41-42 (quotations omitted); *see also Escobar*, 136 S. Ct. at 2002. Under *Escobar*, if Fannie Mae paid claims "despite its actual knowledge" of Petitioners' alleged conduct or similar conduct by other law firms that would be "very strong evidence" of immateriality. 136 S.Ct. at 2003. Judge Rakoff dismissed Petitioners' argument in its motion to dismiss that the conduct alleged by the government is immaterial to Fannie Mae's payment decision because he found that it was "pure speculation" whether Fannie Mae knew of the conduct at issue. *Grubea*, 2018 U.S. Dist. LEXIS 105784, at \*43. The court held that there was no evidence that Fannie Mae had "actual knowledge" of the alleged markup and yet continued reimbursing Petitioners' expenses. *Id.* Evidence that Fannie Mae investigated the very conduct at issue in the government's Complaint – during an audit, on-site visit or some other examination – and continued to reimburse servicers for Petitioners' expenses for years after those audits occurred is dispositive evidence that either: *one*, the expenses at issue complied with Fannie Mae's requirement that the expenses be

actual, reasonable and necessary, or *two,* the alleged false claims at issue were not material to Fannie Mae payment decision.  Either way, the discovery is critical to Petitioners' defense.[6]

For the same reasons, documents regarding audits Fannie Mae conducted of the billing practices of other law firms are critical to Petitioners' defense.  The allegations in the Relator's *qui tam* lawsuit allege that Petitioners' business practices and expenses are illustrative of business practices and expenses that are standard in the industry.  Fourth Amended Complaint, *U.S. ex rel Grubea v. Rosicki, Rosicki & Associates, P.C., et al.,* No. 12 Civ. 7199-JSR, ECF No. 185 ¶ 200-205 (S.D.N.Y. July 13, 2018) attached as Exhibit V to Burnett Decl.  The Relator's complaint alleges that, in New York and across the country, law firms "regularly billed [servicers] for illegal and excessive costs, which the [servicers] included in claims for reimbursement" to Fannie Mae. *Id.* ¶ 205.  If Fannie Mae audited other law firms and continued to reimburse their foreclosure-related expenses despite actual knowledge of their alleged noncompliance with the "actual, reasonable and necessary" requirement, it is further evidence that the conduct alleged in the government's Complaint is immaterial to Fannie Mae's payment decision.  Discovery on the issue of the materiality of Fannie Mae's Servicing Guide – that is discovery from Fannie Mae about its efforts to monitor, police or ignore its own guidelines, which form the legal standard underpinning the government's theory of liability in its case against Petitioners – is highly relevant to the litigation.

---

[6] Petitioner has already adduced evidence that in 2003, 2004, 2005 and 2010 Fannie Mae conducted audits of the Rosicki Firm focused on, among other things, foreclosure-related litigation expenses. Exs. C-E, Burnett Decl.  Moreover, Fannie Mae visited the Rosicki firm dozens of times to review the records and files related to on-going litigation.  Finally, as discussed above, public information from the Inspector General of FHFA demonstrates that Fannie Mae audited its Retained Attorney Network in 2010, regarding the firms' compliance with Fannie Mae's requirements, including foreclosure litigation expenses. *See supra* at 8. It is, therefore, far from speculative that Fannie Mae monitored Rosicki's conduct, as well as that of its competitors in the legal market, on the issues that underlie the questions to materiality in the Underlying Action.

The discovery sought is also relevant to Petitioners' defenses because, as discussed further *infra*, documents regarding audits of other law firms inform the analysis of whether Petitioners' expenses "exceeded market rates," which is highly relevant to the litigation. The government alleges that Petitioners' billed servicers up to 750% of the market rate for certain expenses, and that the claims for reimbursement submitted to Fannie Mae were false because these "inflated" expenses were not "reasonable, actual and necessary." Ex. A, Burnett Decl. ¶ 78, 180. Information about the market for foreclosure litigation expenses - what other similarly situated law firms and their vendors charged for foreclosure expenses - is therefore relevant to Petitioners' defense and the issue of materiality and certainly fair territory for discovery.

Fannie Mae has taken the position that documents and communications related to audits, examinations, investigations, reviews of, or even visits to, law firms are privileged because they would have been conducted on behalf of Fannie Mae's in-house counsel to review compliance with legal obligations. Fannie Mae has not complied with its obligations under Rule 45 to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. Pro. 45(e)(2)(A)(ii). Fannie Mae has stated only that it was "assert[ing] privilege with respect to the audit process, and it will instruct Lyons McCloskey to preserve that privilege, as well." Ex. T, Burnett Decl.

Fannie Mae should be compelled to produce the requested documents for two reasons. First, documents regarding fees and expenses are not protected by attorney-client privilege or the work product doctrine. Second, even assuming that documents related to the monitoring and auditing of law firm expenses are privileged, the attorney-client privilege with respect to

Petitioners should be waived because the government, on behalf of Fannie Mae, has put these expenses at issue in its lawsuit against the Petitioners.

### 1. Fannie Mae Should be Compelled to Produce Documents Regarding Audits and Related Processes Because They Are Not Privileged

Where a federal court is handling a federal question case the federal common law of privilege governs. *See e.g., von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir. 1987). Under federal law, the party claiming the privilege has the burden of showing that a document is privileged. *See United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473-74 (2d Cir. 1996). To meet that burden of demonstrating that a document is protected by attorney-client privilege, "a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *Id.* (*citing Fisher v. United States*, 425 U.S. 391, 403 (1976)).

The attorney-client privilege does not automatically attach simply because the work was conducted on behalf of in-house counsel. *See United States Postal Serv. v. Phelps Dodge Re. Corp.*, 852 F.Supp. 156, 161-62 (E.D.N.Y. 1994) (citing *Federal Trade Comm'n v. TRW, Inc.,* 628 F.2d 207, 212 (D.C. Cir. 1980)) (denying the application of privilege to documents from an outside consultant and communications between in-house counsel and the consultant). "Courts that have considered the application of the attorney-client privilege to independent outside consultants have been cautious in extending its application." *Id.* The party claiming privilege has the burden of showing that the consultants were retained to assist in rendering legal advice. *Id.* at 161.

Here, Fannie Mae has not come close to meeting its burden of demonstrating that the primary purpose and intent of the documents and communications at issue were the seeking or giving of legal advice. Fannie Mae has not identified what legal advice or assistance was sought

or obtained that the documents regarding audits and related processes of expenses pertained. Fannie Mae's blanket assertion that the discovery at issue concerns "compliance with legal obligations" is not sufficient to meet its burden with respect to the substance of each document and communication. *See e,g, U.S. ex rel. Baklid-Kunz v. Halifax Hospital Medical Center*, 2012 U.S. Dist. LEXIS 158944 (M.D. Fla. Nov. 6, 2012); *United States ex rel. Gale v. Omnicare, Inc.*, 2013 U.S. Dist. LEXIS 143831, at *4 (N.D. Ohio Oct. 4, 2013).

Moreover, it is difficult to understand how the documents at issue could be privileged since the subpoena requests seek information about the legal market Fannie Mae set-up and utilized as well as audits of Fannie Mae's retained law firms related to vendor invoices and foreclosure-related fees charged; these are all subjects that are not covered by a privilege because such information does not consist of legal advice.  It is well established that documents and communications concerning the amount of legal fees are not privileged, and legal invoices are generally not protected by the attorney-client privilege unless the description on the billing statement somehow reveals some litigation strategy or the specific nature of the legal services provided.  *See e.g., United States v. Naegele*, 468 F.Supp.2d 165, 171 (D.D.C. 2007) (billing statements and retainer agreements usually are not privileged); *Diversified Group, Inc. v. Daugerdas*, 304 F.Supp. 2d 507 (S.D.N.Y. 2003) (legal invoices that disclose the services provided are not protected by the attorney-client privilege); *Duttle v. Bandler & Kass*, 127 F.R.D. 46 (S.D.N.Y. 1989) (attorneys' bills and communications regarding retainer agreements are not privileged).  Where the details found in billing records and invoices only relate to the general nature of legal services and contain no confidential attorney-client communication, the records are not privileged. *See Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999) ("Inquiry into the general nature of the legal services provided by counsel does not necessitate an assertion of the privilege because the general nature

of services is not protected by the privileged."); *see also United States v. Keystone Sanitation Co.*, 885 F. Supp. 672, 675 (M.D. Pa 1994) (documents regarding the general nature of the services performed by a lawyer is not privileged).  The discovery at issue here does not even concern attorney billing or legal billing records.  Instead, the discovery concerns invoices from vendors rendering non-legal services that did not include the provision of or rendering of legal advice or confidence, where it would be difficult to conceive client confidences and/or litigation strategy would be included on billing statements.  Moreover, Fannie Mae has already produced a spreadsheet containing Petitioners' foreclosure-related expenses for which reimbursement from Fannie Mae was sought.  It is bewildering how Fannie Mae can acknowledge that expenses charged by Petitioners are not privileged, and actually produce data on that point, but claim that the invoices underlying that data, as well as audits of the same information in the invoices, are privileged.

Further, the broader subject matter of the 2010 audit conducted by Lyons McCloskey, an "audit in connection with the Retained Attorney Network and compliance with your engagement letter," is similarly outside the scope of attorney-client privilege. *See* Ex. E, Burnett Decl. Engagement letters and communications regarding engagement letters are not privileged. *See Naegle*, 468 F.Supp.2d at 171; *Duttle*, 127 F.R.D. at 52 (citing *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238 (2d Cir. 1986)).

Indeed, many of the documents being withheld by Fannie Mae – such as the invoices and market rates produced to Fannie Mae and Lyons McCloskey – would appear to be entirely factual in nature.  It is well established that objective facts are not protected by the privilege. *Upjohn v. United States*, 449 U.S. 383, 396 (1981) ("The client . . . may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication with his attorney"); *see also Cobell v. Norton*, 213 F.R.D. 1, 6 (D.D.C. 2003).

Where work and opinions are based on underlying factual data, rather than client confidences, "such underlying factual data can never be protected by the attorney-client privilege and neither can the resulting opinions and recommendations." *Phelps Dodge Ref. Corp.,* 852 F. Supp. at 162; *see also In re Central Gulf Lines*, 2001 U.S. Dist. LEXIS 297 (E.D. La. Jan. 12, 2001).

### 2. Documents and Communications Regarding the Audits are Also Not Protected by the Work-Product Doctrine

The work product doctrine protects only those documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative. Fed. R. Civ. P. 26(b)(3)(A). "The mere fact that litigation does eventually ensue does not, by itself cloak materials with work product immunity." *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 (4th Cir. 1992). Instead, "the document must be prepared because of the prospect of litigation." *Id.* Fannie Mae has made no showing that the documents being withheld were prepared in anticipation of litigation.

Even if the documents at issue are protected by the work product doctrine, the applicability of the doctrine can be overcome if the material is otherwise discoverable and "the party shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. Pro. 26(b)(3)(A)(ii). Petitioners have a substantial need for the discovery requested. As discussed *supra*, the discovery is highly relevant to the issue of the materiality of the conduct at issue to Fannie Mae's reimbursement decision and to the issue of whether Petitioners' expenses were in fact outside the market rate. Evidence that Fannie Mae knew all about Petitioners' billing and continued to reimburse Petitioners' expenses is not only crucial to Petitioners' defenses, it is *only* available from Fannie Mae. There is no substantial equivalent.

### 3. The Privilege Concerning Petitioners Should Be Waived Because the Rosicki Firm's Conduct is at Issue in the Litigation

Even assuming that audits, examinations, investigations, reviews of, or even visits to, law firms retained by Fannie Mae are privileged, the privilege is waived with respect to the Rosicki firm and, therefore, discovery related to audits of Petitioners should not be protected from disclosure. Courts have found that a client can waive the privilege by attacking the attorney's conduct. *See Peyser v. Searle Blatt Co.*, 2003 U.S. Dist. LEXIS 22037, *11 (S.D.N.Y. Dec. 8, 2003). When an attorney's legal advice or conduct are put at issue in a litigation, the attorney must be able to defend themselves against the claims and the client cannot shield from inquiry the totality of the circumstances, including privileged communications.[7] *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D 266, 276-77 (S.D.N.Y. 1958).

Under federal common law, attorney-client privilege may be waived by implication when the client places the privilege information "at issue" in the litigation. *See Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,* 210 F.R.D. 506, 509 (S.D.N.Y. 2002); *see also Pritchard v. County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) (recognizing an at-issue waiver and discussing its applicability when there is an assertion of an advice-of-counsel defense). Courts have articulated a three prong test to determine whether the privileged information has been placed "at issue" in the litigation: (1) a party asserting privilege must take an affirmative act, such as filing suit; (2) the affirmative act makes the privileged information relevant to the case; and (3) application of the privilege would deny the opposing party information vital to his defense. *See Bank Brussels Lambert*, 210 F.R.D. at 509-10. Courts have found "a broad waiver of attorney-

---

[7] ABA's Model Code of Professional Responsibility – DR 4-101 (C)(4) – also provides that an attorney may make disclosures of "confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct."

client privilege where a party asserts a position 'the truth of which can only be assessed by examination of the privileged communication.'" *Id.* at 510 (citations omitted). Courts have generally found a waiver of the privilege where the very subject of privileged communications is critically relevant to the issue to be litigated, there is a good faith basis for believing such essential privileged communications exist, and there is no other source of direct proof of the issue. *Id.*

An examination of all three prongs favors finding the privileged information has been placed at-issue in the Underlying Action and there should be a waiver of the privilege here. First, the government brought the Underlying Action seeking to recover for each claim "on behalf of Fannie Mae." Ex. A, Burnett Decl. ¶¶ 188, 194. By filing a lawsuit against Petitioners related to their services when the firm represented Fannie Mae in foreclosure and post-foreclosure eviction proceedings, the government took an affirmative action on Fannie Mae's behalf that has placed the privileged information at issue.[8] Two, the privileged information at issue is clearly relevant to the litigation. As discussed *supra*, this case boils down to whether Petitioners' expenses complied with Fannie Mae's requirement that expenses be "actual, reasonable and necessary," and whether compliance was material to Fannie Mae's reimbursement decision. Fannie Mae's audit of Petitioners' compliance with its engagement letter with Fannie Mae, in which the "actual, reasonable, and necessary" requirement is incorporated, is unquestionably "at issue" in this

---

[8] In its Motion to Dismiss filed in the Underlying Action, Petitioners argued that the FCA is not applicable in this matter because Fannie Mae is a private corporation, not an agent of the U.S. government, and there was no connection between the claims at issue and federal funds. *Grubea*, 2018 U.S. Dist. LEXIS 105784, at *52. The government argued that because the Federal government placed Fannie Mae under a government conservatorship and funded Fannie Mae with substantial federal dollars, false claims submitted to Fannie Mae were actionable under the FCA. The Court agreed with the government. *Id.* at *53-*56. It would be fundamentally unfair if, on one hand, Fannie Mae were sufficiently connected to the government to allow the claims against Petitioner to go forward, but, on the other hand, sufficiently independent from the government to deny Petitioners' information vital to their defense.

litigation.  Finally, if Fannie Mae were allowed to assert a privilege to withhold the information, which is singularly in Fannie Mae's possession and not available by any other means, it would critically harm Petitioners' defense because the government has alleged that had Fannie Mae known of Petitioners' conduct it would not have paid claims incorporating Petitioners' expenses. *See* Ex. A, Burnett Decl. ¶ 179-181.

Even if the government had not brought this action on behalf of Fannie Mae, there is a compelling basis to find that the privilege should be waived.  Federal courts have recognized that a privilege waiver may apply even when someone other than a client is bringing suit and making the accusation of misconduct against the attorney.  *See First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & CO.*, 110 F.R.D. 557, 568 (S.D.N.Y. 1986); *see also Meyerhofer v. Empire Fire & Marine Ins. Co.*, 497 F.2d 1190, 1196 (2d Cir. 1974). The district court in *First Federal* explained that "if an attorney is sued for alleged misconduct in representing a client, it is self-evident that he has a compelling interest in being able to defend himself" and the attorney's interest "may well outweigh the interest of the client in maintaining the confidentiality of his communications."  *First Federal*, 110 F.R.D. at 565.  Furthermore, this self-defense exception to the privilege rule also "serve[s] the truth-finding function of the litigation process, and is thus consistent with the general principle of narrowly construing evidentiary privileges."  *Id.*  The same reasoning counsels in favor of compelling discovery here.  Pursuant to principles of fairness and equity, the Rosicki firm should be entitled to discovery of all documents regarding its representation of Fannie Mae that are vital to its defense and relevant to the claims at-issue, including those documents being withheld by Fannie Mae.

**B. Fannie Mae Should Be Compelled to Produce Documents and Communications Exchanged with the Government Regarding Petitioners and the Underlying Action**

Fannie Mae has refused to produce documents and communications exchanged with the government regarding Petitioners and the allegations in the Complaint because Fannie Mae asserted that Petitioners "should seek those documents from the government, a party in the case, in the first instance." Ex. S, Burnett Decl.

Fannie Mae's claim that Petitioners should seek the discovery in the first instance from the government is not a basis to withhold the requested documents. Petitioners have served discovery requests on the government, but Petitioners are under no obligation to exhaust all avenues of discovery from the government before seeking the discovery requested from Fannie Mae. Courts have rejected the view that a party "first must attempt to compel production from" an opposing party before a non-party's compliance is required. *See In re Exxon Valdez*, 142 F.R.D. 380, 382 (D.D.C. 1992). "[I]t is far from obvious that obtaining discovery on these issues elsewhere would in fact be more convenient, less burdensome, or less expensive than obtaining it directly from" the non-party. *Id.*

Although it is unclear, Fannie Mae seems to assert that the discovery should also be withheld from production on the basis of common interest privilege and the work product doctrine. Fannie Mae mentions an "understand[ing]" that the government will claim common interest privilege and work product privilege with respect to the discovery. Ex. S, Burnett Decl. Fannie Mae states it "would honor that invocation of privilege, and again, ask that [Petitioners] address it with the government, if need be." *Id.* Fannie Mae has not proved any information that Petitioners could use to assess the nebulous privilege claim. Fannie Mae has the burden to establish that the documents it may be withholding are privileged and conclusory assertions of a privilege are insufficient factual support to meet that burden. *See von Bulow*, 811 F.2d at 146. Absent a privilege

log or any "describe of the nature of the documents" that are being withheld based on a privilege, Fannie Mae has failed to meet its obligations under Rule 45.  Fed. R. Civ. Pro. 45(e)(2)(A)(ii).

Even if some of the documents at issue may be protected from disclosure by the common interest privilege or the work product doctrine, Fannie Mae must demonstrate a particular point in time in which the doctrines became applicable.  The common interest privilege only protects documents from disclosure once "an agreement to undertake a joint legal strategy" has been formed.  *Hunton & Williams v. U.S. Dep't of Justice,* 590 F.3d 272, 285 (4th Cir. 2010) ("Documents exchanged before a common interest agreement is established are not protected from disclosure."); *S.E.C. v. Wyly*, No. 10-cv-5760 (SAS), 2011 WL 2732245, at *2 (S.D.N.Y. July 5, 2011) ("Where the parties have not yet agreed to proceed jointly on the matter communicated, the common interest rule will not apply.").  The "mere indicia of a joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed." *Hunton &* Williams, 590 F.3d at 285; U*.S. v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999) ("Some form of joint strategy is necessary to establish a JDA, rather than merely the impression of one side[.]").  Documents and communications exchanged before an agreement as to a joint legal strategy has been reached are not protected by a common interest privilege.

Similarly, the work product doctrine only protects documents from disclosure that were prepared in anticipation of litigation.  *See* Sec. A.2. *supra*.  Documents and communications exchanged before the anticipation of litigation cannot be withheld based on the work product doctrine.  *Id.*  The government's investigation lasted for almost six years and Fannie Mae was aware of the government's investigation for at least five years.  During that time, litigation did not become a possibility until February 2018, when the government advised Petitioners that there was a sealed *qui tam* complaint Judge Rakoff was going to unseal and Judge Rakoff was forcing the

government to make a decision regarding intervention.  Documents and communications Fannie Mae may have disclosed to the government before litigation was actually anticipated are not protected by work product.

### C. Fannie Mae Should Be Compelled to Produce Documents Concerning Fannie Mae's Investigation of Petitioners Regarding the Allegations in the Complaint

Fannie Mae's claim that Petitioners' request for documents related to its investigation of Petitioners and the allegations in the Complaint is "too broad and non-specific" is perplexing.  The request is very straight forward.  Fannie Mae became aware of the government's investigation of Petitioners' in late 2013, and continued to pay claims related to Petitioners' foreclosure-related expenses for years afterwards.  It was not until April 2018, weeks after the Complaint was filed, that Fannie Mae terminated its relationship with Petitioners.  Petitioners are seeking discovery regarding any investigation Fannie Mae undertook with respect to Petitioners after learning of the government investigation and again, after learning of the Complaint.

The government contends that Fannie Mae was not aware Enterprise and Paramount outsourced work and applied "mark-ups" to those vendors' bills.  Understanding what Fannie Mae knew about Petitioners' expense practices and when they knew it is critically important to establishing whether Fannie Mae believed the expenses complied with its guidelines and whether the conduct alleged was material - or immaterial - to its payment decisions.

### D. Fannie Mae Should Be Compelled to Produce Documents That Are Relevant to the Subject of the Falsity of the Claims

#### 1. Documents Related to Fannie Mae Monitoring of the Quality, Reliability or Timeliness of the Services Provided by Firms in Connection with Foreclosures are Relevant to the Litigation and Should be Produced

Fannie Mae contends that the request for information related to "quality, reliability, and timeliness" is unreasonably broad and not at issue in the Underlying Action, and has refused to produce responsive documents.  Ex. S, Burnett Decl.  Contrary to Fannie Mae's protests, the

information sought is narrowly targeted to seek discovery highly relevant to Petitioners' defenses. Petitioners dispute that the claims submitted by the servicers to Fannie Mae certified compliance with Fannie Mae's Servicing Guide, the legal underpinning for the government's FCA claim. Fannie Mae should be ordered to produce documents concerning its monitoring of the "quality, reliability and timeliness" of the services provided by law firms and vendors retained by law firms in foreclosure proceedings because the discovery is relevant to establishing what was or was not certified by the servicers in their submission to Fannie Mae for expenses.

The government's theory of Petitioners' FCA liability is that the claims submitted by the servicers implicitly certified that the expenses contained therein were "actual, reasonable and necessary" pursuant to Fannie Mae's Servicing Guide. While the claims were truthful on their face, they were nonetheless purportedly false because the government alleges the claims did not comply with this contractual term. But not every supposed breach of contract is actionable under the FCA. *Escobar*, 136 S. Ct. at 2003 (The FCA is not a "a vehicle for punishing garden-variety breaches of contract or regulatory violations."). Instead, what makes a contractual violation false or fraudulent such that the violation may be actionable under the FCA depends on the common law meaning of fraud. *Id.* at 1999. The government alleges that the servicers implicitly certified compliance with the "actual, reasonable and necessary" requirement. Under the common law, a party is only deemed to be implicitly certifying a narrowly limited set of representations about matters that go to the heart of a transaction. *See* Restatement (Second) of Torts § 551(e) & cmt j; *see also* Restatement (Second) of Contracts § 161(b). Thus, nondisclosure of a fact is only equivalent to a misrepresentation when the fact goes to the essence or heart of a transaction. The government asserts that the claims were misleading because the claims omitted "critical qualifying information," that the expenses purportedly included "mark-ups applied by the affiliates." *Grubea*,

2018 U.S. Dist. LEXIS 105784, at *39-*41 (*quoting Escobar*, 136 S.Ct. at 2000).  A relevant question then is what facts went to the heart of the transaction between the servicers and Fannie Mae such that nondisclosure rendered the servicers' submission false and in the context of the servicers' transaction with Fannie Mae, with respect to mortgages in foreclosure proceedings, was information about Petitioners' expenses "critical qualifying information."

"Under the broad sweep of Rule 26(b)(1) of the Federal Rules of Civil Procedure," a party is entitled to discovery regarding any matter, not privileged, which is relevant to any party's claim or defense. *See Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1348-49 (D.C. Cir. 1984); *see also* Fed. R. Civ. P. 26(b)(1).  Petitioners are entitled to discovery that relates to what was critical information to Fannie Mae with respect to mortgages in foreclosure proceedings and what went to the essence of the bargain between Fannie Mae and its servicers and law firms with respect to foreclosure proceedings.  There is evidence that Fannie Mae had concerns other than cost, such as the quality of the services provided, reliability of the servicers and firms, and the timeliness of the services provided.  *See* FHFA Report at 15.  Moreover, there is evidence that these concerns overrode considerations regarding costs.  Petitioners must be permitted to develop evidence that may show that the alleged factual omission at issue here was not critical information in the context of the servicers' and the firm's transaction with Fannie Mae with respect to foreclosure proceedings, and did not go to the heart of the transaction, which is highly relevant to Petitioners' defenses.

Petitioners served a targeted discovery request using the language in Fannie Mae's Servicing Guide, which requires servicers and firms to monitor vendors based on "quality, reliability and timeliness of the services provided."  Fannie Mae Single Family 2012 Servicing Guide, Part VII, § 501.03.01; Part VIII, §§ 106.05 (March 14, 2012), https://bit.ly/2NwnRs9.

Fannie Mae's retention agreement also used synonymous language in directing the firm to conduct foreclosure proceedings "diligently, expeditiously, and properly." Ex. B, Burnett Decl. at 1, 6. Fannie Mae, as the party resisting discovery, has the burden to show that the discovery sought is burdensome or otherwise objectionable. *See von Bulow*, 811 F.2d at 145. Fannie Mae's perfunctory claim that the discovery at issue is "unreasonably broad" fails to meet its burden.

### 2. Fannie Mae Should Be Compelled to Produce Documents Regarding Fannie Mae Employee Training Related to Reimbursement of Foreclosure Expenses

To defend against the government's allegation that the claims submitted to Fannie Mae contained misrepresentations, Fannie Mae should also be compelled to produce documents regarding any Fannie Mae training, advisory or guidance as it relates to reimbursement of foreclosure expenses, specifically, training provided to Fannie Mae employees related to Form 571 and its review and processing.

The claims for reimbursement for foreclosure expenses are submitted by the servicers to Fannie Mae on Fannie Mae's Form 571. Ex. A, Burnett Decl. ¶ 34. Form 571 lists certain expenses related to Fannie Mae owned mortgages in foreclosure and provides space for the servicers to list the related cost. The form makes no mention of service of process, one of the expenses allegedly misrepresented by the servicers via the claim form. The government's argument that the claims Petitioners' caused servicers to submit to Fannie Mae were "half-truths" is based on the assertion that on review of Form 571, "Fannie Mae would probably—but wrongly—have concluded that the expenses" submitted for reimbursement by servicers were the actual expenses incurred by Petitioners without any alleged "mark-up" added to third-party vendor costs for process service and title search. *Grubea*, 2018 U.S. Dist. LEXIS 105784, at *41. The cash disbursement request form–Form 571–that servicers use to submit reimbursement requests simply lists different types of expenses with blank spaces for the claimant to enter dollar amounts and makes no mention of

service of process.   Nonetheless, the Court, at the motion to dismiss stage, agreed that upon receiving the Form 571, Fannie Mae would have concluded that the Form 571 included a misleading half-truth.   What Fannie Mae employees responsible for reviewing and approving reimbursement requests actually presumed that the Form 571 certified – if anything – is central to the government's claims.   The training and guidance Fannie Mae employees received about the Form 571 as well as training regarding ensuring that the claims submitted complied with the servicing guide's requirements is integral to that understanding.

Fannie Mae agreed that it would "search for the requested documents and produce non-privileged documents responsive" to the subpoena request for Fannie Mae training of Fannie Mae employees that related to the reimbursement of foreclosure expenses, including training related to Form 571. To date, Fannie Mae has produced no documents related to Fannie Mae employee training.   This despite the fact that Fannie Mae agreed to produce all responsive documents by August 28, 2018.   The above documents are unquestionably relevant to the Underlying Action. Given the expedited discovery period, Petitioners' do not have the luxury of further delay of the production of these documents.

### E. Fannie Mae Should be Compelled to Produce Documents Regarding Market Rates for Foreclosure-Related Expenses

Fannie Mae agreed that it would "search for the requested documents and produce non-privileged documents responsive" to the subpoena requests related to any market rate information. To date, Fannie Mae has produced no documents related to any market rate information in response to the Subpoena, which were served more than a month ago.   Despite the fact that Fannie Mae agreed to produce all responsive documents by August 28, 2018.

Petitioner cannot effectively respond to the government's claims that its expenses on Fannie Mae-related litigations were significantly inflated and out of step with the market for such

services without information regarding the amounts charged by other law firms and their vendors; that is information that is uniquely held by Fannie Mae about the market for legal services it utilized and that formed the basis for its requirement that such costs be actual, reasonable, and necessary. Fannie Mae retained dozens of law firms as part of its Retained Attorney Network to represent it in foreclosure and post-foreclosure eviction proceedings. Fannie Mae not only regularly reviewed expenses submitted for reimbursement from those law firms, but it audited multiple firms as well regarding, among other things, their costs and expenses. Fannie Mae was in the best position—better than even the servicers—to know what the market rates were for foreclosure-related services; particularly given its size and influence in the housing market and the fact that its guidelines for its Retained Attorney Network effectively dictated the market prices for those services. The market rate information is, therefore, not only critical to Petitioners' defense but uniquely in Fannie Mae's possession.

### F. Transfer of the Motion to Compel to the Issuing Court is Warranted

In the alternative, Petitioner moves pursuant to Federal Rule of Civil Procedure 45(f) to transfer the Motion to the Southern District of New York, where the Underlying Action is pending.

Rule 45(f) expressly allows the transfer of subpoena-related motions from the court where production is sought (here, the U.S. District Court for the District of Columbia), to the court where the Underlying Action is pending (the U.S. District Court for the Southern District of New York), if the "person subject to the subpoena consents or if the court finds exceptional circumstances." *See* Fed. R. Civ. P. 45(f) and advisory committee's note (2013); *see also*, *Fed. Home Loan Mortg. Corp. v. Deloitte & Touche LLP*, 309 F.R.D 41, 42-43 (D.D.C. 2015); *Wultz v. Bank of China, Ltd,* 304 F.R.D. 38, 45 (D.D.C. 2014) ("[T]he text of Rule 45 not only 'hints that another court may be

given the power to…enforce a subpoena,' it explicitly permits it." (quoting *In re Sealed Case*, 141 F. 3d 337, 341 (D.C. Cir. 1998)).

Exceptional circumstances may be found, and transfer warranted, "to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts." Fed. R. Civ. P. 45(f) advisory committee's note (2013).  Transfer is appropriate "if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion." *Id.*  Accordingly, Courts in this District have "found exceptional circumstances warranting transferring subpoena-related motions…when transferring the matter is in 'the interests of judicial economy and avoiding inconsistent results.'" *Wultz*, 304 F.R.D. at 46 (citation omitted); Likewise, transfer of a subpoena-related motion is especially appropriate where the "underlying litigation" is "highly complex and intricate", and the presiding judge often "is in a better position to rule on [the] motion…due to her familiarity with the full scope of issues involved as well as any implications the resolution of the motion will have on the underling litigation." *Id.*

In this instance, transfer to the Southern District of New York is appropriate because resolution of the Motion to Compel implicates substantive issues of privilege and whether Petitioners will be able to obtain documents and information necessary to defend against the claims in this complex and intricate litigation.  Indeed, the discovery seeks documents related to a required element – materiality – that the government must establish in order to succeed under the FCA against Petitioners.  Failure to transfer could also result in inconsistent rulings on the issues presented in the Motion to Compel with other discovery related motions in the Underlying Action if there are discovery disputes in the Underlying Action between the government and Petitioners.  Moreover, transfer will facilitate compliance with the discovery schedule and deadlines so ordered

by Judge Rakoff, which obligates the parties to complete discovery no later than December 14, 2018, and upon which date summary judgment motions are to be served and filed.

In contrast, there are no countervailing reasons to deny transfer in this instance, as Fannie Mae has availed itself of the court where the Underlying Action is pending, having commenced multiple actions there to date, and transfer will impose little or no burden on Fannie Mae, as it regularly conducts business within the Southern District of New York. *See, e.g.*, *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) (noting that as of 2012, the Federal Housing Finance Agency ("FHFA"), as conservator of Fannie Mae, commenced 15 actions on its behalf in New York courts, both federal and state). Accordingly, the minimal—if any—burden imposed upon Fannie Mae to respond to the Motion to Compel in the Issuing Court is far outweighed by the exceptional circumstances presented here.

This Motion seeks to compel Fannie Mae to respond to the subpoena and produce documents and communications that, as discussed in Points I and II, *supra*, are at issue in the Underlying Action and critical to Petitioners' defense. Any claim of privilege is unwarranted or, alternatively, outweighed by the compelling interest of the Petitioners to defend themselves. Thus, in order to determine whether Fannie Mae's claim of privilege is inapposite or the privilege is outweighed by Petitioners' right to defend themselves, necessarily involves a full understanding of the facts and complex issues—including the allegations and defenses asserted—in the Underling Action. Where, as here, the motion is not merely predicated on a "relevancy determination," but necessarily involves "nuanced legal analysis based on a full understanding of the underlying action," Courts in this District have transferred such subpoena-based motions on the basis that the issuing court is "better situated to deal with the full scope of issues raised in the motion to compel,

'as well as any implications the resolution of the motion will have on the underlying litigation.'" *See Deloitte*, 309 F.R.D. at 43 (quoting *Wultz*, 304 F.R.D. at 46).

So too here, the Southern District of New York's time and resources would be better devoted to this particular Motion to Compel, as the issues are dependent upon the documents over which Fannie Mae has claimed are privileged, which go to the very heart of Petitioner's defenses in the Underlying Action. Thus, and as addressed above, to determine the issue of privilege and whether it is waived in this instance, this Court must familiarize itself with the substance of the allegations in dispute, and the defenses to be raised by Petitioners in the Underlying Action. Such an endeavor is better suited for the Southern District of New York, so as to avoid any unnecessary implications the resolution of the Motion would have upon the Underling Action, or upon other issues the Southern District will have to consider.

Transfer is further warranted here given the Southern District of New York's interest in its own case management. *See Deloitte*, 209 F.R.D. at 45. Specifically, the Southern District has so-ordered a Civil Case Management Plan governing discovery, which requires adherence to specific deadlines, such that all discovery—including expert discovery—is to be completed by December 14, 2018, and the action is to be trial-ready by January 28, 2019. This is no trivial task, as the issues in the Underlying Action are varied and complex. Further, as set forth *supra*, the materials sought from Fannie Mae are critical to the defense in the Underlying Action and, against the backdrop of these discovery deadlines, the Motion to Compel should be decided swiftly. Thus, the interest of judicial economy is best served by transferring the Motion to Compel to the Southern District, as it is already well-versed and familiar with the substantive issues involved, and Courts in this District have held that transfer is both appropriate and warranted in light of such consideration. *See Deloitte*, 209 F.R.D. at 45 ("Nothing in the Advisory Committee Note, or

subsequent case law, precludes this Court from relying on other aspects of case management, such as impending discovery deadlines and case-specific issues, to transfer a subpoena-related motion.").[9]

Lastly, in determining the propriety of transfer, consideration must be given to the burden on Fannie Mae, which is—at best—*de minimis*.  Fannie Mae is a government-sponsored enterprise which regularly conducts business throughout the United States, and has, in numerous instances, availed itself of the District Court for the Southern District of New York. As the Court in *Deloitte* noted, entities like Fannie Mae (indeed, the Court specifically addressed Fannie Mae's conservator, FHFA) are "not the kind of 'local' party about which the Advisory Committee to Rule 45 was likely concerned." *Deloitte*, 309 F.R.D. at 44; *see also XY, LLC v. Trans Ova Genetics, L.C.*, 14-mc-00778(CRC), 2014 WL 4437728, at *1 (D.D.C. Sept. 10, 2014); *Judicial Watch, Inc. v. Valle Del Sol, Inc.*, 14-mc-0538(BAH), 2014 WL 4954368, at *5 (D.D.C. Oct. 3, 2014) (finding minimal burden where non-party had "national reach and familiarity with litigation in courts outside this jurisdiction").[10] Thus, transferring the Motion to Compel will impose minimal burden on Fannie Mae—if any—and is far outweighed by the exceptional circumstances presented here.

---

[9] Courts routinely cite similar judicial economy benefits as reason to transfer actions to other jurisdictions where related cases are pending. *See Kafack v. Primerica Life Ins. Co.*, 934 F. Supp. 3, 9 (D.D.C. 1996) (finding that a factor favoring transfer of venue was that "this court has neither dealt with other issues in the suit nor has familiarized itself with the underling merits of the case"); *see also Robertson v. Cartinhour*, 10-cv-8442, 2011 U.S. Dist. LEXIS 126030, *12 (S.D.N.Y. Oct. 28, 2011) (transferring action to D.C. court where "the D.C. Court is uniquely familiarity with the facts and legal theories" at bar).

[10] *See also Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) (noting that FHFA has commenced over 15 actions in New York courts—both state and federal—in or about 2012 on behalf of Fannie Mae and Freddie Mac).

## CONCLUSION

For the reasons discussed above, Petitioners respectfully request that the Court enter an order holding that the documents described herein are not protected by privilege, granting Petitioner's motion to compel documents responsive to Requests 1-11, 16 and 22 of the Subpoena served on Fannie Mae, and compelling Fannie Mae to withdraw the assertion of privilege with respect to documents in the possession, custody or control of Lyons McCloskey.  In the alternative, Petitioners respectfully request that the Court transfer this Motion to Compel to the District Court for the Southern District of New York for their review.

Respectfully submitted,

_____
Stephen J. Rosen
Levine, Blaszak, Block & Boothby, LLP
20001 L St., N.W., Suite 900
Washington, D.C. 20036
srosen@lb3law.com

Daniel J. Horwitz*
Tracy A. Burnett*
McLaughlin & Stern, LLP
260 Madison Avenue, 18th Floor
New York, New York 10016

*Attorneys for Movant Rosicki, Rosicki & Associates, P.C., et al*

* admission pro hac vice pending

40